Case number 19-4240, the United States of America, et al. v. Fazzi Associates, Inc, et al. All arguments not to exceed 15 minutes for plaintiff, 15 minutes to be shared by defendants. Mr. Warner D. Mendenhall for the appellant. Thank you. May it please the court. Co-counsel on this is Jesse Hoyer, who is obviously not to appear today. And we represent the relator in this action, Kathy Owsley, who is a 42-year employed as a nurse, 12 years with Care Connection of Cincinnati. And she submitted an initial complaint and an amended complaint. I am not sure what happened with the docket on not listed. Nevertheless, the respondents were served with the amended complaint. All the briefing is related to the amended complaint. And we have proceeded to argue the points that were raised by the amended complaint. The defendants are a number of and it is essential to understand what Fazzi's role in this was. The respondents, the healthcare companies hired Fazzi to make recommendations on something called an OASIS form, which is fundamental to all home healthcare agencies. Initially, a registered nurse goes out and does this OASIS or Outcome and Assessment Information Set form. It describes the medical condition of the patient, therapeutic needs, and 42 CFR 484.45B requires that that must be accurate at the time of assessment. When the home healthcare companies brought Fazzi into the scene and onto the scene, all of a sudden, the initial classifications of the patients, the initial payment system codes that were put into the OASIS form began to change. And they no longer reflected what the initial RN had seen or the initial healthcare worker had seen with these patients. And the reason that additionally that this is important is because home healthcare is paid through a prospective payment system. So once this initial OASIS form is prepared, it's then submitted, and there's an initial payment made under a request for anticipated payment. And that provides some percentage of the average cost of care over a 60-day period before a submission of the plan of care for that patient. So the more extreme healthcare needs and and Fazzi actually changed what the initial evaluators put on those OASIS forms, which resulted in more healthcare dollars for the home healthcare agencies. Mr. Mendenhall, thank you. This is a very helpful summary. As the facts are alleged in the complaint, do you know, did the Fazzi associates, did they have some ostensible role different from changing the OASIS data to make the patient appear to be sicker than she actually was? Well, I think Fazzi's ostensible role is, it would be, and I'm sure this is in their materials, that they are assisting the home healthcare agencies to get their coding right. I see. That's what they're saying. But the fact of the matter is, because this coding, and we list a number of examples. For example, patient A had a leg wound. The altered diagnosis included then additionally uncontrolled diabetes, hypertension, neuropathy, and morbid obesity when there was no medical documentation to support those diagnoses. Patient B had a leg ulcer that on the OASIS form became a malignant larynx cancer. On part of the list that you just referenced, would you have to have a diagnosis of morbid obesity if the Fazzi people looked at somebody and they were visibly obese? Would that require medical diagnosis? Your Honor, I appreciate your question so much, because the fact of the matter is, and this clears up something I wanted to address, is that Fazzi never looked at these patients. The evaluators looked at these patients, not Fazzi. Fazzi's off-site. The OASIS forms are prepared by the initial evaluator, and they are sent to Fazzi off-site, and Fazzi does a number of things with those forms, such as what I've described, and they also even go back and look. For example, we have an example of a woman who 20 years ago had a fracture. Well, all of a sudden, that fracture shows back up on the OASIS form when it was healed and had been healed for many years and shouldn't affect the billing and that initial request for payment. But counsel, you describe all these patients as patient A, patient B, et cetera. You don't provide any identifying information, no dates, no identifying information about the plaintiffs, no actual evidence of submission or presentation. Isn't that all a problem for you under our pleading standard under 9b? Well, and I think this actually gets to the amendment. Element of the claim, the fraud is only happens when the claim is presented to the government, right? That's what our cases very clearly say. That's correct, and I think our complaint makes it clear. Our client was aware that the request for anticipated payment, anticipatory payment, went in the next morning. She was aware of the timing of that. The patient A, B, C, D, E, F, G, these are actual patients. She knows them. She has the records regarding these patients. This is simply a way to anonymize these patients, but it is possible, and maybe we could get a protective order in an amended complaint where we de-anonymize these patients and have the exact medical records available for the court. We did defend our first amended complaint. We did defend it, but we did also request that the court found a deficiency that we'd be allowed to amend it, which obviously didn't happen, but we do allege in our complaint a period of time, 2014 to through 2019. Our client has since left CCC, the Care Connection of Cincinnati, but through the course of her employment, she saw this as a continuing process. We did have some specific dates in there. We certainly had a range of dates in there, and her time there and the anonymization doesn't take away the fact that these are actual patients. Mr. Mendenhall, to follow up that question, if I may, as Judge Larson points out, it's submission of the claim that creates the fraud. I will grant you that your complaint alleges in considerable detail that there was what most people would call fraud going on with the alterations to the OASIS data for the patients that are described in the complaint, but the fraud under this statute doesn't give rise to liability until a claim is submitted. We don't have specific allegations about when particular claims were submitted for patients A through G or otherwise. How would you, if you're in our shoes, how do we say that that read the Prather case and cited that in other cases? Prather was perhaps a little closer to the claims being submitted than our client was. Our client is maybe one more step removed, but I think the difference here and the reason that the standard that maybe should be relaxed in terms of having the exact claim is she was so experienced. She had 12 years with this company. She saw the change that happened once FASI came into play. She knew that these claims were submitted. She knew OASIS was the foundation for the reimbursement by Medicare. Those are all things that she knew. Her insider status, I think, gives her the credibility to carry this forward. Some of the other cases cited, I believe, in Walgreens and Chesbro, those relators were not but because she had personal knowledge of this, had observed the changes that took place when FASI came in and expressed those concerns. Counsel, does she have personal knowledge of submission of the claims the way Prather does? Prather is our only case that we've ever recognized a departure from basically staple the claim to your complaint. I know, Your Honor, and I'm urging you to have another case that expands that just a little bit maybe. Like I said, she's not as close as Prather was, but we do state in the complaint and allege in the complaint that request for anticipatory payment went in the next morning. She knew it was submitted. I think I'm out of time. That was a perfect timing there, Mr. Mendenhall. I commend you on that. All right. You're going to have your rebuttal. We're going to hear from Mr. Breen and Mr. Howard Dreiermeier. I'm not sure. Whoever's going first, go ahead. Thank you. Good morning, Your Honor. Thank you. May it please the court. George Breen, on behalf of Defend AFL-E's Care Connection of Cincinnati, Gem City Home Care, Ascension Home Care Holdings, we believe the trial court was correct in dismissing Ms. Owsley's amended complaint with prejudice and urge that it be affirmed. I think that the discussions this morning have focused in on the key issue, that this court's precedent has been that a relator in a False Claims Act case must plead a specific false claim or, if it's a far-reaching claim, a representative example of a false claim. And it's not disputed. In this case, the relator does not do that. There is not a single false claim identified anywhere in the four corners of her amended complaint. She has failed to satisfy that standard. What she says is, well, give me a break. Give me the access. Let me have the Prather standard. But even she concedes that she doesn't satisfy Prather. Prather, the only time that we're aware of that this court has ever deviated from the requirement that an actual false claim be submitted, was specific to Prather because of Prather's specific involvement in billing-related details. If I may ask you a question about that. Mr. Mendenhall mentioned that the OASIS is the foundation for reimbursement for Medicare. And as you may know, CMS guidance with respect to submission of these kinds of wraps requires that the patient data in the wrap match the patient data in the OASIS. Were you aware of that? Yes, Rob. Yeah. Okay. So, there has to be a match between the OASIS data and the patient data in the OASIS. As I understand the complaint, the plaintiff here, Ms. Owsley, she's working directly with that OASIS data. She's seeing that data and she's seeing how the FASI associates change that data for purposes of the plans of care on which she signs off. And then the next has to match where the wrap has to match the OASIS data that she's reviewing. In other words, the wrap is going to incorporate that data. Why isn't she directly involved in the billing process? Because the CMS guidance makes OASIS part of that process. Well, I think there's a step that's missing, Your Honor, which is the plan of care. It's not only OASIS data that results in or that is part of the information that's generated with respect to a wrap. It's a plan of care that is ultimately certified by a physician. And the instances that Ms. Owsley describes are instances where she, and they're unidentifiable, as I think we've discussed, as have been discussed previously, not by name, date, location whatsoever. It's the plan of care that has to be certified by a physician. And Ms. Owsley's claim stops at looking at OASIS data. It also doesn't identify any specific wrap. But the CMS guidance says that the wrap, the patient data in the wrap has to match the patient data in the OASIS. And that's, number one, that's what she's working with. Number two, she says she's the last set of eyes on the plan of care. So she's looking at that too. So, I mean, she's looking at and seeing alterations to the principal components of the wraps submitted the next morning. Why isn't that involvement in the billing process? Well, respectfully, Your Honor, she doesn't say anywhere in a complaint that she reviewed plans of care for the instances that she described. And so what she then says is that this is information that is included in a wrap. She doesn't say what happens in the billing department when it gets this information. So, I mean, this case is different from cases where the fraud allegations are sort of, you know, pretty sketchy and, you know, the fraud itself is not pleaded with particularity. They do plead with considerable particularity that FASI Associates is changing the OASIS data without any basis for doing so. They allege that with great particularity. And that OASIS data then has to be replicated in the wrap, which is being submitted to the government the morning after she's done with the file. So are we required to assume then, as we look at the complaint, that in every instance where this is happening, that the person who then takes the file from Ms. Owsley is changing the OASIS data back to what the evaluating nurse said? So removing what the alleged fraud by the FASI Associates so that the bill itself doesn't include these alterations alleged in the complaint every time that's happening by the next morning. Is that what we're required to construe the complaint to mean? Your Honor, honestly, we have no information in the record which indicates what happens at billing. That's the link that's missing here. Prather says, you know, there has to be a strong inference that fraudulent bills actually get submitted. Why in the world is FASI doing all these alleged alterations? And the plaintiff herself working towards submission of a wrap, doing the components that have to be included in a wrap. Why in the world is all this being done if not to submit bills based on this activity? I mean, isn't it just totally obvious that, of course, they're sending the wraps in based on all this stuff? Or is there some other reason? Is there any other reason in the world someone would do OASIS coding other than to submit a Medicare bill? Oh, I don't think that there's a reason to do OASIS coding absent having some one piece of the process. And that's where Ms. Owsley stops. The plan of care, this has to be certified by a clinician. That isn't addressed anywhere in Ms. Owsley's complaint. The physician doesn't have to sign off in writing before submission of the wrap, though. That's my understanding. Is that correct? He or she does not, Your Honor. But that also means that if there's a I would suggest to you that there's also not anything pled in the complaint that indicates that in these instances, again, unidentifiable, that wraps were actually submitted. Because there's been no indication that Ms. Owsley actually sees a wrap. She doesn't. I get it. She just doesn't work there in that part. And under Prather, she has to have detailed billing knowledge, and that's the point. She doesn't have that. So how specific, Mr. Breen, does that personal billing-related knowledge have to be under Prather? So, Your Honor, my time is up. How specific? Go ahead, sir. Can I answer your question? Yes. I appreciate that. Your Honor, I think the distinction between Prather is Prather actually knows what happens with the billing. She's got she had evidence to indicate what the dates of service were, what the dates of the requested payment may have been, what the amount of the requested payment was, that she worked off of a checklist to bill specific claims, that she actually had specific information to indicate that bills were submitted on what date, which dates of service, for what amounts, and had confirmation this was all done. None of that appears in Ms. Owsley's complaint. That's the level of specificity and the detail that Ms. Owsley doesn't have. Sir, if I may just ask you one more quick question, because obviously you're very knowledgeable about how this whole process works. Is there any alternative explanation, if one takes the allegations and the complaint is which obviously we must, that what I call this upcoding is happening by the Fazi Associates, and that it has no legitimate basis with respect to the patient's actual condition? Is there any alternative, is there any explanation other than defrauding the government for this pattern of activity? Well, Your Honor, I think what happens, and counsel for Fazi would be is that there's an effort to make to look at the patient in its entirety, the patient's physical condition in its entirety. That includes the patient's medical history. That is what the payment is based on. It's not based on a specific incident that may have required a particular involvement. I get that, but if the complaint has alleged sufficiently that the basis for doing so, fraudulently, you know, in sort of a more vernacular sense, if they've alleged that that OASIS data is being changed fraudulently, is there any alternative explanation for that activity other than submitting a fraudulent bill to the government? So, Your Honor, just so I can make sure I understand your question. Sure. Okay. You're saying that if they're doing it fraudulently, is there any reason to do it fraudulently except to defraud the government? Correct. Is there an alternative explanation for all this? They say Fazi's totally cooking the books with respect to the OASIS data. Is there any alternative, is there any explanation other than defrauding the government with a fraudulent wrap? Is there any alternative explanation for this activity alleged in the explanation? I don't know what the explanation would be, Your Honor, if the argument is that she's alleged satisfactorily that Fazi was falsifying data. I mean, again, all right. I just have one more question, which is how many, well, the complaint alleges that 60% of Care Connections patients are insured by government health care plans. Does that sound, well, I guess what the complaint alleges. It doesn't matter whether that's right. But we would have to assume then that, in other words, the answer to Judge Kethledge's question might be, well, it's to defraud a private insurer, right? Because 40% of these aren't insured by the government, right? 40% of your patients, at least. That's based on the allegation. Yes, Your Honor. So, and that wouldn't state a false claims act claim, right? So. No, and the other reality to that is if you look at the other allegations, I'm sorry, Your Honor. It wouldn't be good. It wouldn't be noble, but it wouldn't be a false claims act claim. No, I mean, it's fair to say, I think it's also fair to point out that there are things that are said, for instance, that Ms. Alzi suggests this happens nationwide. She's only ever worked in one place. And the notion that this gets to go across the country with every home healthcare facility, there's no specificity of particularity with respect to any of that. There are just no facts pledged, as there are no facts pledged that indicates that there was a rap issue with respect to these instances that are unidentifiable. But you're right. It could be for that. But again, it's looking at the patient in totality, which is something that's not addressed by Ms. Alzi. Just one follow-up question, Mr. Green. And I really do appreciate your being a good sport about all these questions. Do your clients prepare OASIS data? Do they do that for purposes of submitting bills to private insurers? Or is that only done with respect to bills submitted to the Your Honor, I don't know that I can answer that question. Maybe a tool that is utilized irrespective of private versus government. It's a standard tool, but I don't know that I could answer that question. Okay, that's fine. That's fine. All right. Well, thank you, sir. We appreciate your argument, and we'll hear from your co-defense counsel. Thank you, Your Honor. Thank you, Your Honor. Doug Hallward-Dreemeyer on behalf of Fozzie Associates. Prather case established a narrow exception to this court's otherwise consistent requirement that in a False Claims Act case, it would later lead with particularity specific to- Sir, could you speak up a little bit or maybe get closer to the microphone? Yes, Your Honor. Is this better? Yes, a little bit. Thank you. The Prather case established a narrow exception to the requirement that this court has otherwise consistently insisted upon that the relator plead with specificity specific representative claims. And in the Abana's case, this court returned to Prather and characterized it as applying, quote, only if relator alleges specific personal knowledge that relates directly to reference that false claims were in fact submitted. The dissent in that case in Abana's tried to focus on the last part of that requirement, a strong inference that claims were submitted. But the majority insisted upon as well the specific personal knowledge relating directly to billing practices. And that is because, as the court has noted, the FCA focuses liability specifically on the submission of false claims. In Prather, the complaint alleged the dates of submission of RAPs. What's the big deal? I mean, what's the big deal with dates? I mean, say hypothetically, I know the complaint doesn't do this, but let's say the complaint said and for patients A through G, you know, these bills were submitted within the limitations period for this claim or whatever. I mean, why would that be? You want to know, like, what's the fraud that I'm accused with? You know, what's the conduct where I committed fraud? Isn't that really what this 9B is going after as opposed to it was February rather than November? Well, Your Honor, I think there are two purposes. One, the specificity does put the defendant on notice about what their alleged fraud is. And here we have no idea. We were unable to identify any of the particular claims that are that are supposed to have been submitted here because there are no details here to allow us to do that. So that purpose of 9B is absolutely unavailable to us. But more importantly, and remember, this is a substitute for otherwise consistent requirement that specific claims be, as Judge Larson suggested, appended to the complaint in effect. And what the date of the RAP, the amount of the RAP, the confirmation that the RAP was submitted all do is give the court confidence that this person knows that the government was, in fact, defrauded because claims were submitted. If you had the names of patients A through G, would that satisfy your question or your concern about we don't know what we did wrong? If you know which patients they are and you know what they're saying Fazi Associates did to the file, does that answer your concern about what we do here? It would perhaps be a start, Your Honor, but it would still not satisfy the requirement that the specific knowledge be with respect to the billing in particular. And let's talk about that because, as I mentioned, the CMS guidance says that the patient data in the RAP has to match the patient data in the OASIS, which is what she's working on. So why isn't that involvement in the billing process? Because what she's looking at and complaining about is incorporated directly into the RAP. Well, Your Honor, two things, at least two things that we don't know. In Abanias, the court talks about needing every step of the process up to the end. And I think were later admitted that they were one step away. They're actually multiple steps away. And the complaint identifies in paragraphs 57 through 59 that in numerous instances, the nurse looking at this says, no, that's actually not accurate. It needs to be revised. The complaint acknowledges that when it leaves relators hands, the doctor has not yet submitted, reviewed it. Now you're right, Your Honor, that the regulations don't require that the physician have reviewed before it's doesn't prohibit that the doctor have reviewed before submission. We don't know what further revisions may have been made before submission. And I do want to take issue with the assertion that this is clear allegations of fraud, because as Relators Council has acknowledged, what's really going on here is his client's complaint that FASI looks at the whole record, including past reports, the full medical record. And if the full medical record of a patient indicates that that patient suffers from diabetes, even though a particular Oasis report by a particular clinician at that time may not reflect that fact, that fact would be significant to the care provided to that patient. And it should be reflected and it doesn't need to have been observed by that one to make sure that the full record is reviewed and all of that is reflected on an Oasis, even if one particular clinician doesn't have view of all that is relevant here. And so we don't know whether the clinician and the doctor looked at it and said, oh my gosh, good thing that FASI caught that, or maybe it was a mistake. Maybe the FASI coder was looking at two files at the same time and that was caught and a change was made. We don't know that. We don't know anything about what happens after it leaves Relator Owsley's hands. We know that there is a time that passes. We know that the RAP has to be prepared. She doesn't do that. And we know that then there has to be a decision to submit a claim. And she doesn't know that either. She can only speculate what amounts might be. When FASI is looking at these records and coding them or making additional codes, this is just my own information. Is there communication by and between FASI and Ms. Owsley's entity to talk about the coding that FASI is doing and why and what records they're relating? Does FASI just make its code independently and send them on off to wherever they send them? So, your honor, the best that we have in the record to shed light on this is a submission that we made and it's referred to at pages 8 to 9 of our brief. And I believe it's record 44-1. And it's a template that FASI uses. And what the template shows is that FASI has notes at the end that indicate the changes that have been made and explains why. And an example is given. If a patient has trouble moving around, walking, and the question is, can the patient take their medicines unassisted? In this example, the OASIS had said, yes, the patient can take their medicines unassisted. Well, that may mean that they can pick the medicine up and pick the glass up and do that. But if they need to get a glass of water to take their medicine and they can't get to the sink, then they need assistance. And that's what FASI is doing. Yeah. Let me interrupt you and ask you a different question related to something you just said. So, take a different hypothetical. Let's say that the initial rep doesn't have in there a reference to diabetes. FASI upcodes and puts in a reference to diabetes. So, in those notes that FASI puts down there, does FASI also show what record it references to come to that determination? Your Honor, we don't have actual records. What we have suggested in the same template is an example that there is an explanation of how they arrived at that recommendation. So, again, diabetes would be based upon the patient's medical history, not the particular OASIS. And that's what I'm saying on that medical history, because it seems like both entities would have the same medical history. And so, if FASI comes up with some different medical history in their notes, I'm just asking if it would be their routine to reference whatever that note was. And if that's outside of the record, sorry. It's outside of the record, Your Honor. I do know that in the example that an explanation is given for how FASI arrived at the... But what I is making recommendations. The complaint is clear, and FASI does not dispute this at all, that FASI cannot finalize an OASIS. That is only the clinician's job. It's only the HHA's job. FASI can only make recommendations based upon what they think the more accurate coding would be. And the complaint, again, at paragraphs 57 to 59, is clear that there were instances that relates that... Let me ask you a question since we're kind of in the red zone here. When you say that FASI is only making recommendations, is it your understanding that the physician who was supposed to eventually sign off on the plan of care, is that the person who is dispositive as to the OASIS data? It would be either the clinician or the physician. The physician views the plan of care. What's the difference between clinician and physician as you use those terms? The clinician may be a registered nurse or other specific... Such as Ms. Owsley? No, Ms. Owsley is not. She is a quality control nurse, but she does not see patients. That's why at the end of the day, only the clinician or physician that sees the patient can sign off on the OASIS. All FASI can do... You would agree nobody's seeing the patient after Ms. Owsley signs off on a plan of care and the OASIS data. No, but the people who have seen the patient at that time have opportunity to review and correct if that's necessary. At the end of the day, that's what's critical here, is that because there are these two additional steps between when it leaves Ms. Owsley and any claim is submitted, if a claim is submitted, we haven't satisfied the requirement of the bias to take it all the way to conclusion. And I just want to make one... I think we're out of time. The amended pleading, I just want to draw the court's attention to... 15 seconds. Yep. The Harper case makes clear that what happened here is a generalized statement at the end of opposition is not adequate. The Harper decision came down four months before the opposition was and Mr. Mendenhall was counsel in the Harper case, so he knew that that was not adequate. Okay. All right. We understand your point. We appreciate your argument and... Oh, please go ahead. May I ask one more question? Yeah, of course. Sorry. Counsel, do you practice... Does FASI operate sort of nationwide so that you practice in other circuits? Yeah. Yes. Yes, Your Honor. I understand that our rule, or this is my understanding, is our 9B standard is stricter than the standard in other circuits. That's my general understanding. First of all, do you agree with that? And secondly, if that's right, would this complaint survive in any other circuit? In other words, I think our standard might be out of step. We might be more strict than any other circuit. If that is true, would this complaint survive in other circuits, but not here? Your Honor, I don't think that this complaint would survive in other jurisdictions. The standard is stated slightly differently in other circuits, but I think all circuits focus on the claim, just as this court rightly does. And here, the deficiencies where there is this gap between where it has left Relator Owsley's hands before any claim may be submitted, we don't know. She says it's insufficient. Well, Your Honor, we know that it leaves her hands. We know that things can happen. And then we know that she does not have the information about a date being submitted or confirmation that a claim that she is referring to. Of course, we're looking at the claims that she's identified in her complaint. She doesn't say that she has knowledge of any of them. I don't mean to hijack the question. So if you want to take literally 10 or 15 seconds, finish your answer to Judge Larson's question. I want to underscore that FASI has not been sued in any other jurisdiction. If one thought that this was happening throughout the country, you would think that we would have been. We've never been sued in another jurisdiction, and I think that the outcome would be the same in any of the circuits. Thank you, Your Honor. Okay. Any further questions? All right. Thank you, sir. We appreciate your argument, both of your arguments on the defense side, and we'll hear rebuttal. Thank you. Thank you very much, Your Honor. To address a couple of quick things, I also operate in other circuits, and I currently have a case in the Seventh Circuit, and I'll tell you how the judge handled it. He granted a motion to dismiss, but in the grant, without any motion, he stated that we had an additional 30 days to file an amendment if we so desired. So that is a common occurrence. You don't generally have to move for that amendment. Well, you already amended once, right? And you didn't specify in the district court what you would add, other than maybe names of patients A through G. And I appreciate that, Your Honor. The first amended complaint was amended shortly after the to the motions to dismiss. I think that that timing of that is important in terms of whether it's an adequate time frame to amend that complaint. We think we do deserve one amendment to deal with those motions to dismiss and the outcome of that. The other thing is that I think that the complaint itself, I think it's clear from the complaint itself, and I would assert that there are some inferences that can be made. We certainly indicated that we had many more examples than the one that we presented in the complaint. We indicated we turned those examples over to the government, and also these patients are cared for a long period of time. So we do have additional information on many more patients that could go into an amended complaint. So we would like the chance to do that and to get a broader range of information. And perhaps we need a protective order for the more detailed information that we would be presenting to the court. But we could certainly manage that with the defendants. The other thing that I this is really about, you know, a showing of prejudice. You know, again, we didn't multiply move the court for amendment after amendment. We have one amendment after the declination. I think that there is some requirement based on Bledsoe, on Fomen, that the respondents have to show a showing of prejudice when we want to make an amendment. I don't think that they can do that. We are certainly not asking for a chance to amend for undue delay, bad faith, or dilatory motive. And we haven't had repeated failure to cure deficiencies. And I will also say this about the first amended complaint. There were a couple deficiencies in that complaint, and I wasn't part of the amendment. But, you know, they had cited part of the statute at one point that had been changed, and the citation was wrong. So those changes needed to be made to cure a couple of deficiencies in that pleading, regardless of what else happened on the case. I do want to address... Can I ask you one question, sir, Mr. Mendenhall? Is there any basis at all in the complaint here for potential liability on the part of any of these agencies other than CCC, the one for which Ms. Owsley worked? I don't see anything about Ascension or any of these other defendants. Well, we certainly do have, you know, we have one of the... from the Dayton office, we have one of those examples is from Dayton, and that's the GEMS. The other thing is that this pattern, and I guess this gets to Judge Larson's question about the national scope of this, Bozzi has a training academy. We are alleging that in their training academy, they teach people how to change the OASIS form so that they are able to boost the initial wrap, the reimbursement from the initial wrap. So Bozzi has a corporate culture, corporate training that does extend nationally, and we know from the Indiana office that sent people from Indiana to come to Cincinnati to be trained, so it certainly extends to the Indiana office. But this is a way to... and this is how Bozzi develops its business, I believe. It's a business plan. They go in, they tell the home health care agencies, we're going to boost your reimbursements. Here's how we do it. We do it through this specific training. These are the methodologies. Once you implement it, it boosts up. So they do receive a benefit from the increased reimbursements. Their benefit is all these contracts that they get nationally. Okay. Any further questions from the other judges? All right. Well, hey, I want to thank all the counsel for your fine arguments this morning. It's an important case, and we appreciate your participating, especially at relatively late notice. One thing I neglected to ask about, but it's just as well because it's sort of an complaint in this case, has remained sealed apparently in the district court, and I believe in ours. In our circuit, like many others, we have strict requirements about when a document submitted to the court can be sealed. If the court bases a decision on that document, as obviously the court did with respect to the complaint. Rather than act preemptorily though, I would ask if anyone has an objection to unsealing the complaint, please, why don't you send the court basically like a 28-J letter, five pages or less. If you think that either portions of these complaints should remain confidential, redacted, or the whole thing, which is kind of questionable, you could explain why. The relevant case for our circuit is called Shane Group versus Blue Cross Blue Shield. I apologize. I don't have a site handy, but it's easy to find. I think it's 2014. Okay. Well, thank you all again for your arguments, and I think that's it for this morning.